

FILED

JAN 18 2007
JAN 18 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

AE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SECURITIES AND EXCHANGE COMMISSION,   )
  )
                       Plaintiff,   )
  )
v.   )
  )
JOHN M. FIFE and   )
CLARION MANAGEMENT, LLC,   )
  )
                  Defendants.   )
  )

07CV347
JUDGE KENNELLY
MAG. JUDGE COLE

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges the following:

### NATURE OF THE ACTION

1.     In 2002 and 2003, defendants John M. Fife ("Fife") and Clarion Management, LLC ("Clarion Management") (collectively, "Defendants") engaged in a fraudulent scheme to purchase variable annuity contracts issued by the Lincoln National Life Insurance Company ("Lincoln") in order to engage in "market timing" in mutual funds for the benefit of Clarion Capital, LP ("Clarion Capital"). Clarion Capital was a Chicago-based hedge fund formed by Fife for the express purpose of engaging in market timing through the purchase of variable annuity contracts. Fife controlled Clarion Capital and carried out the scheme through Clarion Management, the hedge fund's general partner and unregistered investment adviser.

2.     Knowing that Lincoln's variable annuity contracts were not intended for professional market timers and that Lincoln monitored activity in these contracts to restrict

excessive trading and took steps to prevent professional market timers from obtaining contracts, Defendants engaged in a deceptive scheme using nominee trusts and other deceptive tactics to purchase dozens of contracts and engage in hundreds of market timing trades for the benefit of Clarion Capital.

3.      To accomplish their scheme, Defendants first created dozens of phony family trusts that were in fact wholly owned by and for the benefit of Clarion Capital and controlled by Clarion Capital through its adviser, Clarion Management. Defendants then purchased the variable annuity contracts, which were both funded by and for the benefit of Clarion Capital, in the names of these nominee trusts to hide Clarion Capital's financial interest in all of the contracts.

4.      After obtaining each contract, Defendants engaged in market timing activity in the mutual funds offered through the variable annuity contracts until they exceeded the level of transfer activity permitted by Lincoln for individual contracts, at which time Lincoln restricted Defendants from further market timing activity in each such contract by requiring them to submit future transfer requests in such contract by U.S. Mail. Lincoln's general practice was to restrict contracts that exceeded 24 transfers (12 round-trips) per year.

5.      By August 2002, when Lincoln began restricting some of these contracts due to excessive transfer activity, Defendants had invested more than $10 million of Clarion Capital's funds for market timing activity at Lincoln through 17 separate contracts held in the name of different family trusts.

6.      When Lincoln restricted a particular contract purchased by Defendant for Clarion Capital though a nominee trust, Defendants engaged in further deceptive conduct to put Clarion Capital's money back to work, circumventing Lincoln's efforts to restrict market timing by

2

withdrawing most or all of the funds in such contract, and then using different nominee trusts to purchase more contracts and engage in more market timing, again using Clarion Capital funds and again for the benefit of Clarion Capital.

7.     On or around November 25, 2002, after Lincoln detected some common patterns in Defendants' market timing scheme, including the fact that all of the trusts through which Defendants were purchasing the contracts designated Clarion Management as their trustee, Lincoln informed Defendants that it would block the purchase of any new contracts where, among other things, Clarion Management was the trustee.

8.     Rather than ceasing their market timing activities, Defendants applied additional layers of deception to evade Lincoln's restrictions. After receiving the November 25 letter, Defendants again purchased a dozen additional contracts for the benefit of Clarion Capital in the name of new nominee trusts owned and controlled by Clarion Capital. In addition, in order to circumvent Lincoln's additional restriction concerning Clarion Management, Defendants created and used new nominee trustees, wholly owned and controlled by Clarion Management, in connection with the purchase of additional contracts, in order to conceal Clarion Management's control over the new trusts and continuing role in the scheme.

9.     During the scheme, Defendants engaged in numerous additional deceptive practices in connection with the purchase of variable annuity contracts from Lincoln in order to conceal Clarion Capital's common ownership of and interest in the annuity contracts and its professional market timing activities through these contracts. These additional deceptive practices included, among other things: (a) obtaining and providing to Lincoln separate tax identification numbers for each trust to suggest, falsely, that the annuity contracts really were for the benefit of separate, unrelated family trusts; (b) using seven different brokers through whom

3

Defendants purchased the contracts in order to diffuse attention; (c) falsely representing to at least one broker that the family trusts were owned by wealthy families; (d) designating different contact addresses on some of the later contracts to make the contracts appear unrelated to Clarion Management; (e) providing Lincoln, for some applications, with selective, incomplete and misleading portions of trust documents falsely suggesting that the trusts were for the sole benefit of natural persons; and (f) in some cases, purchasing contracts with a relatively modest initial investment amounts (under $50,000) to avoid any increased scrutiny that might arise from larger contracts, and then after the contracts were approved, investing hundreds of thousands of dollars more of Clarion Capital funds into the contracts to be used for market timing.

10.     Defendants' deceptive conduct throughout the scheme was intended to and had the effect of frustrating Lincoln's efforts to police against market timing, circumventing the specific restrictions that Lincoln specifically imposed in connection with the contracts that Defendants caused to be purchased for Clarion Capital's benefit, and concealing Clarion Capital's identity and professional market timing activity.

11.     Ultimately, Lincoln was able to detect and block Defendants from obtaining new contracts, but not before Defendants had purchased 39 variable annuity contracts from Lincoln, through which Defendants applied millions of dollars of Clarion Capital's funds for market timing activity. During the period of the scheme, Defendants were able to engage in more than 900 market timing transfers (450 "round-trips") for the benefit of Clarion Capital, through their use of nominee trusts, trustees, and various other deceptive means.

12.     During the period of the scheme, Defendants made hundreds of thousands of dollars in profits for Clarion Capital and themselves from engaging in market timing in the mutual funds offered through Lincoln's variable annuity products. These profits came at the

expense of other mutual fund shareholders, the mutual funds and Lincoln, which was forced to expend resources to detect and put a stop to Defendants' market timing scheme.

13. Through the activities alleged in this Complaint, Fife and Clarion Management violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. As relief, the SEC seeks: (a) a finding that Fife and Clarion Management violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) a finding that Fife was a control person of Clarion Management for the purposes of Section 20(a) of the Exchange Act; (c) the entry of orders of permanent injunction against Fife and Clarion Management prohibiting them from engaging in future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (d) ancillary relief in the form of disgorgement of ill-gotten gains against Fife and Clarion Management, with prejudgment interest; and (e) the imposition of a civil monetary penalty against Fife.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

15. Venue is proper in this district because many of the acts and transactions alleged in this Complaint occurred in this district, and also because Defendant Fife resides in the district and Defendant Clarion Management's principal place of business is located in this district.

16. The Commission seeks a permanent injunction, disgorgement of ill-gotten gains and the imposition of a civil penalty pursuant to Section 21(d) of the Exchange Act. [15 U.S.C. §78u(d)].

17. Defendants, directly or indirectly, made use of the mails and means of instrumentalities of interstate commerce in connection with the transactions, acts, practices, and

courses of business alleged herein.

## **DEFENDANTS**

18.     John M. Fife, age 46, is a resident of Chicago, Illinois. At all relevant times, Fife controlled Clarion Capital through its general partner and unregistered investment adviser, Clarion Management.

19.     Clarion Management, LLC is an Illinois limited liability company organized in January 2001. At all relevant times, Clarion Management acted as the general partner and unregistered investment adviser to Clarion Capital. At all relevant times, Clarion Management was wholly owned by Clarion, Inc., which was wholly owned by Fife.

20.     At all relevant times, Fife controlled Clarion Management. At all relevant times, Fife had the authority to exercise control and did exercise control over Clarion Management in all aspects of Clarion Management's activities, including: (a) the purchase and surrender of variable annuity contracts; (b) all investment strategy and transfer activity in the variable annuity contracts purchased for the benefit of Clarion Capital; (c) all market timing activity; (d) the creation of trusts, limited liability companies and trustees associated with Clarion Management or Clarion Capital; (e) the creation and implementation of Clarion Capital's investment strategy; (f) the actions of all persons employed by Wacker Services Corporation, an affiliated entity, who performed services for Clarion Management; and (g) the designations of contract owners, annuitants, beneficiaries and trustees in applications submitted in connection with the purchase of variable annuity contracts from Lincoln for the benefit of Clarion Capital.

## THE FRAUDULENT SCHEME

### *Background*

#### *Market Timing*

21.     Market timing refers to the practice of short-term buying and selling of shares of the same mutual fund in order to exploit inefficiencies in mutual fund pricing.

22.     In this case, Defendants sought to engage in market timing in mutual funds comprised of equity securities traded on overseas exchanges in Europe and Asia.

23.     Market timing in such international mutual funds seeks to exploit the fact that the prices set by such funds for overseas equity securities in their portfolios reflects the closing prices on the foreign exchange where the foreign securities are listed. These foreign exchanges close hours before the U.S. national exchanges and securities markets ("U.S. markets"). Consequently, the prices used for valuing the foreign securities in international mutual funds may not reflect changes in the global markets that occurred after the close of the foreign exchange but before the close of the U.S. markets. Market timing seeks to take advantage of this stale pricing of foreign securities in the portfolios of international mutual funds.

24.     Most market timing purchases are followed by redemptions the next business day or shortly thereafter, in order to lock in the gain from the pricing inefficiencies. Each market timing purchase followed closely thereafter by a redemption is commonly referred to in the securities industry as a "round-trip."

25.     Market timing, while not illegal *per se*, can adversely affect mutual fund shareholders because profits that a market timer takes can dilute the value of the shares held by long-term shareholders. In addition, the frequent in-and-out trading necessary for market timing activity disrupts portfolio management, increases trading costs (which all shareholders bear), and

7

may cause the mutual fund to realize capital gains at inopportune times.

26.     As a consequence, many mutual funds are averse to market timing and typically prohibit market timing altogether or impose limitations on the frequency of trades in order to limit market timing.

### Clarion Capital, LP

27.     In January 2001, Fife formed Clarion Capital as an Illinois limited partnership for the express purpose of engaging in market timing in international mutual funds.

28.     Clarion Capital operated as a hedge fund, raising money from multiple wealthy investors through a private placement offering.

29.     In the private placement memorandum provided to its investors, Clarion Capital identified Clarion Management as its general partner, and disclosed that Clarion Management was responsible for devising and implementing Clarion Capital's market timing strategy.  The private placement memorandum also disclosed that Fife was a principal of Clarion, Inc. and that Clarion, Inc. was the manager and sole owner of Clarion Management.

30.     In its private placement memorandum, Clarion Capital acknowledged that most international mutual funds did not permit market timing by ordinary investors.  Clarion Capital informed investors that, because of this, it would be engaging in market timing in international mutual funds indirectly, through variable annuity products offered by insurance companies.  Clarion Capital explained that the reason for this was that most international mutual funds permitted ongoing sales and redemptions of international mutual funds by insurance companies, as opposed to ordinary investors, due to the insurance companies' need to continually purchase and redeem their shares in these international mutual funds to accommodate the investment decisions of the thousands of individual investors who have invested their funds in the insurance

8

companies' financial products.

31.     Clarion Capital acknowledged in its private placement memorandum that some of the insurance companies that sell variable annuity contracts might impose their own restrictions on trading in the event that Clarion Capital was deemed to be engaged in excessive trading through the variable annuities.

32.     Consequently, and as stated in the private placement memorandum, it was also Clarion Capital's express intention not to acquire these variable annuity contracts directly, but instead to acquire them through wholly-owned limited liability companies.

33.     The private placement memorandum warned investors that the opportunity to engage in market timing in variable annuity contracts might be limited by future regulatory action because market timing "can be seen as effectively diluting the interests" of other shareholders.

34.     Lincoln was one of the insurance companies through whom Defendants pursued their market timing strategy on behalf of Clarion Capital.

35.     As the general partner for Clarion Capital, Clarion Management operated all aspects of the partnership, including carrying out the market timing investment strategy.  For these services, Clarion Management charged Clarion Capital an annual management fee of 2% of assets under management and a monthly performance-based fee of 20% of the profits from trading.

36.     At all relevant times, the offices of Clarion Capital and Clarion Management were located at 303 East Wacker Drive, Suite 311, Chicago, Illinois 60601.

37.     Fife dissolved Clarion Capital in November 2003.

*Lincoln National Life Insurance Company*

38.     Lincoln is an insurance company based in Fort Wayne, Indiana.

39.     At all relevant times, Lincoln offered various variable annuity products among its financial products.

40.     Variable annuities are securities contracts offered by insurance companies as a long-term savings vehicle. In a variable annuity contract, the insurance company agrees to make periodic payments to the annuitant, beginning immediately or at some future date, typically retirement. Variable annuities are purchased by a contract owner, who is the person with the ability to exercise the rights within the contact, including making investment allocations, selecting payout options, and designating the annuitant and the beneficiary. At the time of purchase, the purchaser identifies the following: the contract owner, who has the ability to exercise the rights within the contract; the annuitant, who is the person upon whose life the annuity benefit payments are made; and the beneficiary, who is to receive any death benefit paid if the annuitant dies before the annuity commencement period. Usually, but not always, the contract owner of a variable annuity is also the annuitant.

41.     Variable annuity contracts, including the contracts at issue in this lawsuit, permit the contract owner to withdraw funds from, or surrender the contract prior to, the annuity commencement period. In such cases, the funds are returned to the contract owner or to a beneficiary or account designated by the contract owner.

42.     During the life of a variable annuity contract, the contract owner may invest the funds used to purchase the variable annuity in securities offered through the variable annuity. The securities offered through the variable annuity are typically mutual funds specifically sponsored by mutual fund complexes for insurance companies and certain tax-qualified

10

retirement plans. These mutual funds are not sold directly to the general public, but are often patterned on, and managed similarly to, retail mutual funds offered by the fund complex.

43.     The value of a variable annuity depends on the performance of the investment options in which the contract owner chooses to invest his or her purchase premiums.

44.     Insurance companies, including Lincoln, offer variable annuities through prospectuses filed with the Commission. The prospectuses set out the costs of the variable annuity, the mutual funds offered, and the procedures for transferring funds in and out of different mutual funds offered through the variable annuity product. The prospectuses also describe the insurance companies' policies, if any, on market timing.

45.     Insurance companies, including Lincoln, typically require contract owners to purchase variable annuity contracts through an independent broker authorized by the insurance company.

46.     Insurance companies, including Lincoln, deliver the variable annuity prospectuses to purchasers of variable annuity products along with the prospectuses for the various mutual funds available for investment.

47.     During the relevant period, Lincoln required that all applications for variable annuity contracts be submitted through an authorized, independent broker. Lincoln permitted applications to be handwritten or submitted electronically.

48.     As part of the application process for such products during the relevant period, Lincoln required applicants to identify the contract owner, annuitant and beneficiary. Where a trust was designated as the owner, Lincoln also required the applicant to identify the trustee for the trust.

49.     At all relevant times, Lincoln's variable annuity products offered a range of

investment options to contract owners, including money market instruments and international mutual funds. Pursuant to the terms of Lincoln's annuity policies, contract owners did not purchase or sell shares of mutual funds directly from the mutual funds, but instead placed their orders with Lincoln, which accepted orders by telephone, internet, fax or U.S. Mail.

50.     At all relevant times, Lincoln aggregated and pooled contract owners' funds into subaccounts, with each subaccount corresponding to a particular mutual fund that Lincoln offered through the variable annuity product. Lincoln submitted aggregated orders each day from each subaccount to each corresponding mutual fund as a single net buy or sell order. Contract owners invested in and out of mutual funds by transferring all or a portion of their investment between one subaccount and another.

51.     Defendants engaged in market timing for the benefit of Clarion Capital through Lincoln's variable annuities to take advantage of this aggregation of orders. By market timing through variable annuities, Defendants could hide Clarion Capital's market timing activities amidst the orders pooled by Lincoln, thereby avoiding detection by the international mutual funds.

52.     In order to engage in such market timing, however, Defendants and Clarion Capital needed to evade the efforts of Lincoln to detect and curtail their professional market timing activity.

53.     Virtually all of Defendants' market timing activity at Lincoln occurred through the purchase of one particular variable annuity product Lincoln offered: the ChoicePlusII Access Variable Annuity.

54.     For the ChoicePlusII Access Variable Annuity, Lincoln required each contract owner to make an initial "purchase payment" of at least $10,000 within two days after Lincoln

12

received an application for a contract, and required additional annual purchase payments of at least $300 per year. Lincoln's prospectus for the ChoicePlusII Access Variable Annuity provided that "purchase payments in total may not exceed $2 million without Lincoln Life approval."

55. Lincoln's prospectus for the ChoicePlusII Access Variable Annuity also provided, in relevant part, that:

> Transfers (within and/or between the variable and fixed subaccounts) are limited to twelve (12) per contract year unless otherwise authorized by Lincoln Life.
> . . .
> This contract is not designed for professional market timing organizations or other entities using programmed and frequent transfers.
> . . .
> Repeated patterns of frequent transfers are disruptive to the operation of the sub-accounts, and should Lincoln Life become aware of such disruptive practices, Lincoln Life may refuse to permit such transfers.

56. During the relevant period, as part of its efforts to police and restrict market timing, it was Lincoln's general practice to limit contract owners to 24 transfers per year, after which Lincoln required contract owners to submit any additional transfer requests by U.S. mail (rather than by telephone, fax or internet), thereby rendering it virtually impossible to engage in further market timing through that contract since the restricted owners would no longer be able to exploit same-day pricing inefficiencies in the international mutual funds.

57. At all relevant times, Lincoln enforced these restrictions through internal operating systems that only processed transfers actually submitted by U.S. mail for such restricted contracts.

58. During the relevant period, Lincoln also monitored variable annuity contracts and transfer activity to detect patterns of frequent transfers and block professional market timers who used multiple accounts to circumvent Lincoln's transfer limits.

### Defendants' Deceptive Scheme

#### Overview of Scheme

59.     Defendants' deceptive scheme began in 2002, prior to purchasing any annuity contracts from Lincoln. During this time, Defendants' caused the creation of dozens of nominee trusts and limited liability companies, secretly owned and controlled by Clarion Capital. Defendants subsequently caused these trusts and limited liability companies to be used as nominee owners and beneficiaries in the contracts Defendants caused to be purchased from Lincoln, in order to conceal Clarion Capital's professional market timing activity.

60.     Defendants caused the creation of at least 17 of these trusts, which Defendants misleadingly characterized as family trusts. Defendants used fictitious family names for the trusts, one for each letter of the alphabet. These names included Austin, Brady, Cooper, Davis, Ellis, Good, Hunt, Ivy, Jasper, Kane, Lewis, Mead, Neil, Oak, Post, Queen and Ross.

61.     Each family trust identified a "Participant Beneficiary," which, according to the terms of each trust, was to receive 100% of all trust distributions after payment of fees and expenses to the trustee for the trust.

62.     Defendants caused various limited liability companies to be created for the purpose of acting as the nominal Participant Beneficiary for each trust, in order to mask Clarion Capital's financial interest in the trusts. In truth, these limited liability corporations were wholly owned and controlled by Clarion Capital, pursuant to operating agreements prepared at the direction of Defendants. Defendants used an alphabetical naming system for these shell companies, using names such as Alta Scholarship Fund, LLC, Branberry Associates, LLC, Cypress Associates, LLC, Draper Family Partners, LLC, and Eisenhower Family Partners, LLC.

63.     Fife signed each trust agreement on behalf of both Clarion Management and the

14

Participant Beneficiary.

64.     Fife also signed each of the Participant Beneficiaries' operating agreements on behalf of the Participant Beneficiary, Clarion Capital, and Clarion Management.

65.     Each of the family trusts designated Clarion Management as trustee. Under the terms of the trust agreements, Clarion Management was empowered and authorized to make all decisions and take all actions on behalf of the trusts.

### Phase 1 of the Scheme: May 2002 through August 28, 2002

66.     In May 2002, Defendants began purchasing, either directly or through persons and entities under their control, variable annuity contracts from Lincoln for the benefit of Clarion Capital.

67.     During the period from May 2002 through August 28, 2002, Defendants caused at least 17 variable annuity contracts to be purchased from Lincoln for the purpose of engaging in market timing activity for the benefit of Clarion Capital.

68.     At the time that they caused these purchases, Defendants knew or were reckless in not knowing that Lincoln's variable annuity products were not intended for professional market timers such as Clarion Capital.

69.     In connection with their purchase of variable annuity contracts from Lincoln, Defendants disguised and concealed Clarion Capital's common financial interest in each of these contracts.

70.     Defendants accomplished this deception by causing each contract to designate one of the family trusts as the nominal owner and to designate either the family trust or the Participant Beneficiary named in the trust document as the beneficiary.

71.     None of the applications that Defendants caused to be submitted identified

Clarion Capital or disclosed that all the contracts were being purchased using Clarion Capital's funds and were for the benefit of Clarion Capital.

72.     Defendants did not disclose to Lincoln in connection with their purchases of any variable annuity contracts from Lincoln that Defendants were professional market timers who were purchasing the contracts from Lincoln solely for the purpose of engaging in market timing on behalf of a single hedge fund, Clarion Capital.

73.     The disclosures that Defendants caused to be made to Lincoln in connection with the purchases of variable annuity products were intended to and had the effect of disguising Clarion Capital's role and common financial interest in all of the contracts.

74.     By dividing Clarion Capital's investments into multiple contracts owned by nominee family trusts, Defendants deceptively concealed from Lincoln both the fact and extent of Clarion Capital's market timing activity.

75.     To further give the appearance that the trusts were legitimate and that the various nominal contract owners and beneficiaries that Defendants designated in the various contracts they caused to be purchased were unrelated, Defendants caused each of the trusts to obtain its own tax identification number, which Defendants caused to be disclosed in connection with each application.

76.     Although it was not identified as a contract owner, beneficiary or annuitant in any of the contracts, Clarion Capital funded each of the contracts and derived the primary benefit from the market timing activity that Defendants engaged in through each contract.

77.     Set forth below is a chart identifying and providing some of the details concerning each of the deceptive applications that Defendants caused to be submitted during Phase 1 of the scheme. The chart indicates whether the application was handwritten or electronic, and shows

16

the date of application and effective date of the contract, the contract number, and the names of the nominal owner and beneficiary designated in the application.

| Ref. No. | Form of Application | Date of Application / Effective Date of Contract | Contract No. | Contract Owner Identified on Application | Beneficiary Identified on Application |
|---|---|---|---|---|---|
| 1. | Handwritten | 5/2/2002 5/6/2002 | 92-9773368 | Neil Family Trust | Neil Family Trust |
| 2. | Handwritten | 5/2/2002 5/6/2002 | 92-9773369 | Lewis Family Trust | Lewis Family Trust |
| 3. | Handwritten | 5/2/2002 5/6/2002 | 92-9773370 | Mead Family Trust | Mead Family Trust |
| 4. | Handwritten | 6/19/2002 6/20/2002 | 92-9774460 | Austin Family Trust | Austin Family Trust |
| 5. | Handwritten | 6/19/2002 6/20/2002 | 92-9774461 | Cooper Family Trust | Cooper Family Trust |
| 6. | Handwritten | 6/19/2002 6/20/2002 | 92-9774462 | Ellis Family Trust | Ellis Family Trust |
| 7. | Handwritten | 7/9/2002 7/10/2002 | 92-9774882 | Jasper Family Trust | Eisenhower Family Partners, LLC |
| 8. | Handwritten | 7/9/2002 7/10/2002 | 92-9774883 | Ross Family Trust | Ross Family Trust |
| 9. | Handwritten | 7/19/2002 7/22/2002 | 92-9775136 | Good Family Trust | Branberry Associates, LLC |
| 10. | Handwritten | 7/19/2002 7/22/2002 | 92-9775139 | Hunt Family Trust | Cypress Associates, LLC |
| 11. | Handwritten | 7/24/2002 7/25/2002 | 92-9775240 | Queen Family Trust | Queen Family Trust |
| 12. | Handwritten | 7/24/2002 7/25/2005 | 92-9775241 | Brady Family Trust | Brady Family Trust |
| 13. | Handwritten | 7/24/2002 7/25/2002 | 92-9775242 | Davis Family Trust | Davis Family Trust |
| 14. | Electronic | 8/19/2002 8/27/2002 | 92-9806101 | Post Family Trust | Alta Family Scholarship Fund |
| 15. | Electronic | 8/19/2002 8/27/2002 | 92-9806102 | Oak Family Trust | Eisenhower Family Partners, LLC |
| 16. | Electronic | 8/19/2002 8/27/2002 | 92-9806103 | Ellis Family Trust | Eisenhower Family Partners, LLC |
| 17. | Electronic | 8/19/2002 8/27/2002 | 92-9803104 | Ross Family Trust | Cypress Associates, LLC |

78. Defendants caused Fife or Clarion Management or both to be listed as the trustee(s) on the applications for each of the family trusts in whose name the contracts were purchased.

79.     Defendants used the business address of Clarion Management as the address for each contract: 303 East Wacker Drive, Suite 311, Chicago, Illinois 60601.

80.     Defendants caused the applications for these contracts to designate as annuitants for the contracts relatives of Fife, Fife himself or employees of an affiliated entity, Wacker Services Corporation.

81.     During this first phase of the scheme, Fife prepared and signed most of the handwritten applications himself; others were submitted electronically by the broker who received information from Defendants, directly or indirectly, designating the nominal owner, beneficiary, annuitant and trustee for each contract.

82.     For each of the applications submitted electronically, Fife received from Lincoln and signed a document verifying the accuracy of the information contained in the electronic applications. Fife also signed verifications for at least some, if not all, of the handwritten applications.

83.     During Phase 1 of the scheme, at least one broker, Jason Slezak, asked Fife about the source of the money for the contracts Fife was causing to be purchased at Lincoln. Fife, in furtherance of his deceptive scheme, falsely informed Slezak that he was investing money on behalf the wealthy families whose names appeared in the title of the trusts that were designated as contract owners for the variable annuity contracts.

84.     Defendants engaged in market timing for the benefit of Clarion Capital, using Clarion Capital's funds, in all of the variable annuity contracts identified in this Complaint that Defendants caused to be purchased from Lincoln.

85.     By late August 2002, more than $10 million of Clarion Capital's funds were invested in Lincoln's variable annuities at the same time and engaged in market timing activity

through 17 separate contracts held by nominee trusts. By dividing Clarion Capital's investment among these 17 contracts, Defendants circumvented Lincoln's $2 million monetary limit on purchase payments for individual contracts absent its approval. By engaging in market timing through 17 nominee trusts, Clarion Capital was able to make dozens of market timing trades for the benefit of Clarion Capital while concealing Clarion Capital's common financial interest in all of the market timing activity.

86.     By late August 2002, Defendants had caused more than 24 transfers to occur in at least the first two contracts they purchased, through the Neil Family Trust and the Lewis Family Trust.

87.     Lincoln, through its monitoring practices, identified these two contracts as having exceeded the allowable number of trades.

88.     Consequently, and in accordance with its market timing policing practices, Lincoln sent restriction letters to the Neil Family and Lewis Family trusts in late August 2002, stating that the transfer activity in the accounts was excessive and disruptive to the operations of the funds, and notifying the trusts that Lincoln was restricting them from engaging in further market timing activity by requiring future transfer requests in these contracts to be submitted by U.S. mail.

89.     The restriction letters, addressed to the family trusts, were sent to Clarion Management's offices at 303 East Wacker Drive, Suite 311 in Chicago, which is the address provided by Defendants for each of the contracts.

90.     Lincoln also sent copies of the letters to the broker through whom Defendants purchased the variable annuities for the benefit of Clarion Capital. The broker forwarded the letters to Defendants.

91.     Through their receipt of these letters, Fife and Clarion Management were aware that Lincoln was restricting further market timing activity in these two contracts, and was also aware that Lincoln objected to the volume and frequency of Defendants' market timing activity in these two contracts.

***Phase 2 of the Scheme: August 29, 2002 through November 25, 2002***

92.     Notwithstanding the restriction letters, Defendants continued to engage in deceptive conduct as part of their scheme to market time in Lincoln variable annuities for the benefit of Clarion Capital.

93.     Even after receiving the restriction letters on or around August 29, 2002, and even though all of the contracts, including the two restricted ones, were for the benefit of a single hedge fund, Defendants continued their market timing activity in their other contracts for the benefit of Clarion Capital.

94.     As a result of Defendants' deception, Lincoln was not aware that these other contracts, like the two restricted ones, were all for the benefit of the same entity: Clarion Capital.

95.     As these other contracts reached 24 transfers, Lincoln restricted them, too, and sent restriction letters to the trusts and the brokers through whom the contracts were purchased.

96.     In response to the restriction letters from Lincoln, Defendants caused the trusts to withdraw all or most of the funds in the restricted contracts. Defendants then reinvested Clarion Capital's funds in new contracts, in the name of different trusts, again to mask Clarion Capital's continuing professional market timing activity.

97.     From August 29, 2002 through mid-November 2002, Defendants caused the purchase of 10 more variable annuity contracts from Lincoln for the benefit of Clarion Capital,

again using nominee owners and beneficiaries in order to mask Clarion Capital's common ownership of and financial interest in all of these contracts.

98.     For two of the contracts, Defendants used revocable trusts (as opposed to the family trusts) as the nominee owners. These revocable trusts – the Dover Revocable Trust and the Burke Revocable Trust – also masked Clarion Capital's financial interest by using limited liability companies, secretly owned and controlled by Clarion Capital, as Participant Beneficiaries. As discussed in the allegations relating to Phase 3 of the scheme, the revocable trusts contained additional deceptive elements that figured more prominently during that phase.

99.     None of the applications that Defendants caused to be submitted during Phase 2 of the scheme identified that Clarion Capital funded each contract and that each contract was funded by and for the benefit of Clarion Capital.

100.     None of the applications that Defendants caused to be submitted during Phase 2 disclosed to Lincoln that Defendants were professional market timers who were purchasing annuities for the purpose of engaging in market timing on behalf of a single hedge fund.

101.     Set forth below is a chart identifying and providing some of the details concerning each of the applications that Defendants caused to be submitted during Phase 2 of the scheme. The chart indicates whether the application was handwritten or electronic, and shows the date of application and effective date of the contract, the contract number, and the name of the nominal contract owner and beneficiary designated in the application.

| Ref. No. | Form of Application | Date of Application / Effective Date of Contract | Contract No. | Contract Owner Identified on Application | Beneficiary Identified on Application |
|---|---|---|---|---|---|
| 18. | Electronic | 10/3/2002 10/4/2002 | 92-9809663 | Cooper Family Trust | Cypress Associates, LLC |
| 19. | Handwritten | 10/9/2002 10/22/2002 | 92-9810015 | Ross Family Trust | Cypress Associates, LLC |
| 20. | Handwritten | 10/9/2002 10/22/2002 | 92-9810016 | Neil Family Trust | Draper Family Partners, LLC |
| 21. | Electronic | 10/23/2002 10/24/2002 | 92-9810386 | Oak Family Trust | Eisenhower Family Partners, LLC |
| 22. | Electronic | 10/23/2002 10/24/2002 | 92-9810387 | Ross Family Trust | Cypress Associates, LLC |
| 23. | Electronic | 10/23/2002 10/24/2002 | 92-9810388 | Post Family Trust | Alta Scholarship Fund, LLC |
| 24. | Electronic | 10/30/2002 10/31/2002 | 92-9810782 | Dover Revocable Trust | Draper Family Partners, LLC |
| 25. | Electronic | 10/30/2002 10/31/2002 | 92-9810783 | Burke Revocable Trust | Branberry Associates, LLC |
| 26. | Electronic | 11/8/2002 11/13/2002 | 92-9811078 | Jasper Family Trust | Eisenhower Family Partners, LLC |
| 27. | Electronic | 11/7/2002 11/13/2002 | 92-9811079 | Kane Family Trust | Alta Scholarship Fund, LLC |

102.    Through their deceptive conduct, Defendants were able reinvest in new contracts Clarion Capital funds that Lincoln had expressly restricted from further market timing activity in other contracts.

103.    In addition to the information provided in the above chart, during Phase 2 of the scheme Defendants caused Fife or Clarion Management or both to continue to be listed as the trustee(s) on the applications for each of the family trusts in whose name the contracts were purchased.

104.    During Phase 2 of the scheme, Defendants also caused the applications for these contracts to continue to designate as annuitants for the contracts relatives of Fife, Fife himself or employees of an affiliated entity, Wacker Services Corporation.

105.    For the two revocable trusts, Defendants listed Wellington Management Services, LLC ("Wellington Management Services") as the trustee. As is discussed in more detail in the

allegations relating to Phase 3 of the scheme, Wellington Management Services was just a shell that Defendants caused to be created to conceal the identity of Clarion Management, which actually controlled and managed the revocable trusts.

106.    Defendants continued to use the business address of Clarion Management as the address for each contract purchased in the name of a family trust: 303 East Wacker Drive, Suite 311, Chicago, Illinois 60601. However, for Wellington Management Services and the revocable trusts, Defendants used a different mailing address at a shared office space services company in Chicago. The address was: 401 North Michigan Avenue, Suite 1200-2, Chicago, Illinois 60601.

107.    During Phase 2 of the scheme, and as indicated in the above chart, most of the applications were submitted electronically by the broker, who received information from Defendants, directly or indirectly, designating the nominal owner, beneficiary, annuitant and trustee for each contract.

108.    Fife prepared and signed the two handwritten applications submitted during Phase 2 of the scheme.

109.    For each of the applications submitted electronically throughout the scheme, Fife received from Lincoln a document to verify the accuracy of the information contained in the electronic applications, which Fife signed and returned to Lincoln.

110.    As was their practice during Phase 1 of the scheme, Defendants engaged in market timing for the benefit of Clarion Capital in each additional variable annuity contract Defendants caused to be purchased from Lincoln during Phase 2 of the scheme.

111.    As of mid-November 2002, and as a result of their deceptive conduct, Defendants remained actively engaged in market timing in at least 14 Lincoln variable annuity contracts, and had by this time made hundreds of thousands of dollars in market timing profits for Clarion

Capital through Defendants' market timing activity in those contracts.

112.    As a result of their deceptive conduct, Defendants were able to deceive Lincoln and purchase in Phase 2 all of the contracts listed in the above chart and engage in market timing through these contracts in the mutual funds offered by Lincoln for the benefit of Clarion Capital.

113.    By November 25, 2002, Lincoln had completed an investigation concerning the pattern of market timing activity in the family trusts utilized by Defendants, which was prompted by the high volume and frequency of transfers in the contracts held by the trusts. Through this investigation, Lincoln learned that all of the family trusts shared a common trustee, Clarion Management, and that all were associated with Fife. Lincoln did not know that the trusts were owned by Clarion Capital, but had determined that the trusts originated from the same address in Chicago and that the address was also used by another firm associated with Fife, Chicago Venture Partners, LP ("Chicago Venture Partners"). Although Chicago Venture Partners was in reality not associated with any of the family trusts contracts, Lincoln erroneously believed that it was the source of the contracts.

114.    Consequently, on or around November 25, 2002, Lincoln sent a letter to Fife's attention stating that it would no longer accept any new business where Clarion Management or Chicago Venture Partners was the owner or trustee of the contract. In the letter, Lincoln also identified and restricted a number of existing contracts that Lincoln had linked to Clarion Management or Chicago Venture Partners, requiring that all future transfers for these contracts be made by U.S. mail.

115.    Defendants received the November 25, 2002 letter, and had notice of the prohibitions set forth therein.

24

***Phase 3 of the Scheme: November 25 Through November 13, 2003***

116.    Rather than ceasing all further market timing activity though Lincoln's annuities after receiving the November 25 letter, Defendants continued to use deceptive measures to purchase more variable annuity contracts and engage in market timing for the benefit of Clarion Capital, creating even more devious schemes to evade Lincoln's market timing policing efforts.

117.    After receiving the November 25 letter, Defendants ceased using the family trusts as the nominal owners for these new annuity contracts. Defendants did so because the family trusts designated Clarion Management as their trustee.

118.    Instead, Defendants purchased new contracts through various revocable trusts that concealed Clarion Management's continuing role in the scheme. These revocable trusts included the Qwest Revocable Trust, the Jones Revocable Trust, the Harris Revocable Trust, the Fisher Revocable Trust, the Carter Revocable Trust, the Elfman Revocable Trust, the Irving Revocable Trust, the Arthur Revocable Trust, the George Revocable Trust, the Kent Revocable Trust, and the Logan Revocable Trust.

119.    Defendants caused all of these trusts to operate pursuant to amended and restated trust agreements, all of which were dated November 8, 2002.

120.    Fife signed each of these amended and restated trust agreements as President of the limited liability company named as the Participant in the trust and also as President of Clarion Management.

121.    In contrast to the family trusts, Defendants caused each of these revocable trusts to designate a nominee trustee for the trust different in name from Clarion Management. These nominee trustees included: Hudson Capital Management, LLC; Wellington Management Services, LLC; Mellon Management, LLC; and Keystone Management Services, LLC.

122.    The nominee trustees were simply shell companies used to conceal Clarion

Management's continuing involvement in the scheme. Each nominee trustee was a limited

liability company that Defendants caused to be created pursuant to an operating agreement that

was dated September 17, 2002. The operating agreements all provided that Clarion Management

solely owned and controlled the limited liability company and that Fife was the company's

President.

123.    Through their deceptive use of these revocable trusts as nominal contract owners,

Defendants were thus able to conceal the continuing role of Clarion Management in the scheme.

124.    Between December 16, 2002 and January 15, 2003, Fife and Clarion Management

caused the purchase of 12 more contracts from Lincoln for the benefit of Clarion Capital through

these nominee revocable trusts.

125.    The specific information concerning contract owner, trustee and beneficiary that

Defendants caused to be submitted in the applications for each of the contracts purchased during

Phase 3 of the scheme was as follows:

| Ref. No. | Form of Application | Date of Application / Effective Date of Contract | Contract No. | Contract Owner Identified on Application | Trustee Identified on Application | Beneficiary Identified on Application |
|---|---|---|---|---|---|---|
| 28. | Handwritten | 12/10/2002 12/16/2002 | 92-9811794 | Qwest Revocable Trust | Hudson Capital Management, LLC | Qwest Revocable Trust |
| 29. | Electronic | 12/13/2002 12/16/2002 | 92-9813608 | Jones Revocable Trust | Mellon Management, LLC | Jane Pearson |
| 30. | Electronic | 12/13/2002 12/16/2002 | 92-9813609 | Harris Revocable Trust | Mellon Management, LLC | Kelly Villanti |
| 31. | Electronic | 12/13/2002 12/16/2002 | 92-9813610 | Fisher Revocable Trust | Mellon Management, LLC | Rachel Fife |
| 32. | Handwritten | 12/17/2002 12/17/2002 | 92-9811915 | Carter Revocable Trust | Wellington Management Services, LLC | Carter Revocable Trust |

| 33. | Electronic | 1/15/2003 1/15/2003 | 92-9813621 | Elfman Revocable Trust | Wellington Management Services, LLC | Elfman Revocable Trust |
| 34. | Electronic | 1/15/2003 1/15/2003 | 92-9813622 | Jones Revocable Trust | Mellon Management, LLC | Jones Revocable Trust |
| 35. | Electronic | 1/15/2003 1/15/2003 | 92-9813623 | Irving Revocable Trust | Mellon Management, LLC | Irving Revocable Trust |
| 36 | Electronic | 1/15/2003 1/15/2003 | 92-9813624 | Arthur Revocable Trust | Wellington Management Services, LLC | Arthur Revocable Trust |
| 37. | Electronic | 1/15/2003 1/15/2003 | 92-9813625 | George Revocable Trust | Mellon Management, LLC | George Revocable Trust |
| 38. | Electronic | 1/15/2003 1/15/2003 | 92-9813626 | Kent Revocable Trust | Keystone Management Service, LLC | Kent Revocable Trust |
| 39. | Electronic | 1/15/2003 1/15/2003 | 92-9813627 | Logan Revocable Trust | Keystone Management Service, LLC | Logan Revocable Trust |

126.     As part of their added deception during Phase 3 of the scheme, Defendants

designated on these applications new mailing addresses and drop boxes in Chicago for all of the

nominal trustees and contract owners in order to make them appear to be unrelated to Clarion

Management. On approximately a weekly basis during Phase 3 of the scheme, mail received for

the four new companies was forwarded to Clarion Capital's offices at 303 East Wacker Drive.

127.     Also as part of the scheme, Fife also no longer signed the handwritten

applications or contract verifications, causing and directing someone else to sign them.

128.     Through their deceptive actions to mask Clarion Capital's financial interest in all

of these contracts and conceal Clarion Management's control over the nominal trustees

designated in the contract applications submitted during Phase 3 of the scheme, Defendants were

able to purchase these additional contracts and engage in additional market timing on behalf of

Clarion Capital.

129.     As an additional and new component of their deception during Phase 3 of the

scheme, Defendants provided, directly or indirectly, incomplete and misleading documentation

to Lincoln concerning the trust agreements for the revocable trusts to falsely suggest that a natural person was the beneficiary of the trusts.

130.    Defendants engaged in this additional deception because they had become aware that Lincoln and other insurance companies were subjecting to greater scrutiny contract applications that designated limited liability corporations as trustees.

131.    Defendants were also aware that Lincoln sometimes required variable annuity contract applicants who were trusts to submit the trust agreement to verify the identity of the beneficiary of the trust.

132.    Defendants were additionally aware that Lincoln sometimes required them to provide documentation concerning the trusts, including the signature page of the trust, and that the trust agreements for the family trusts that Defendants had been using in the scheme listed limited liability companies on the signature page as the Participant Beneficiary.

133.    Part of the Defendants' purpose in creating the revocable trusts and designating them as owners of the variable annuity contracts was to permit Defendants to show to Lincoln, if needed, a trust beneficiary who was a real person.

134.    To accomplish this, Defendants caused the amended and restated trust agreements to create two different nominal beneficiaries: labeling them a "Participant" and an "Individual Beneficiary."

135.    As with the "Participant Beneficiaries" designated in the prior family trusts, Defendants caused the Participant for each revocable trust to be a limited liability company wholly owned by Clarion Capital.

136.    Rather than vesting the Participant with a 100% interest in the distributions from the trust as was the case with the family trusts, Defendants instead caused the Participant's

interest in the revocable trusts, net of the trustees' fees and expenses, to be reduced slightly, to 99.9%.

137.    Defendants caused the revocable trusts to provide that the remaining 0.1% of trust distributions would be distributed to the Individual Beneficiary. The persons Defendants caused to be designated as Individual Beneficiaries were all either relatives of Fife or employees of affiliated companies.

138.    As part of their scheme to hide from Lincoln the identity of these limited liability company Participants, Defendants caused each of the amended and restated trust agreement for the revocable trusts to contain two signature pages. The first signature page showed the signature blocks of the trustee and the Individual Beneficiary. The second signature page included only the signature block of the limited liability company that was serving as the nominee Participant Beneficiary.

139.    During Phase 3 of the scheme, whenever Lincoln required verification of the identity of the beneficiary of the revocable trusts, Defendants caused only the first page of the trust agreement and the signature page that included the Individual Beneficiary to be transmitted to Lincoln, and did not otherwise disclose to Lincoln either that the Individual Beneficiary listed on the signature page had only a miniscule beneficial interest in the trust or that the primary beneficiary per the trust agreement was actually a limited liability company.

140.    Defendants caused such limited and misleading documentation to be provided to Lincoln in connection with at least the Qwest Revocable Trust and the Carter Revocable Trust.

141.    Through their deceptive conduct, Defendants falsely represented to Lincoln that the Individual Beneficiary was the primary beneficiary of the trusts, and concealed the fact that the primary beneficiaries of the trusts were in reality limited liability companies.

142.    As part of the scheme, and particularly during Phase 3, Defendants caused many of the contracts to be purchased with initial purchase payments in relatively modest amounts (under $50,000) in order to escape increased scrutiny. After Lincoln approved the contracts, Defendants increased Clarion Capital's investments in these contracts by hundreds of thousands of dollars.

143.    This deceptive initial funding included at least the following contracts: Elfman Revocable Trust, Jones Revocable Trust, Irving Revocable Trust, Arthur Revocable Trust, George Revocable Trust, Kent Revocable Trust, and Logan Revocable Trust.

144.    As a result of their deceptive conduct, Defendants were able to deceive Lincoln and purchase in Phase 3 all of the contracts listed in the above chart and engage in market timing trading in these contracts for the benefit of Clarion Capital.

145.    All of the contracts purchased during Phase 3 were funded by Clarion Capital.

146.    On or around March 27, 2003, Fife and Clarion Management attempted to purchase three more Lincoln contracts for the benefit of Clarion Capital, using previously unused revocable trusts to disguise Clarion Capital's beneficial interest.

147.    Defendants caused the applications for these contracts to include the following information concerning the owner, trustee and beneficiary:

| Ref. No. | Date of Application | Contract No. | Contract Owner Named in Application | Trustee Named in Application | Beneficiary Named in Application |
|---|---|---|---|---|---|
| 41. | 3/27/2003 | 92-9833708 | Crimson Revocable Trust | Danielle Gallet | Crimson Revocable Trust |
| 42. | 3/27/2003 | 92-9833717 | Avalon Revocable Trust | Danielle Gallet | Avalon Revocable Trust |
| 43. | 3/27/2003 | 92-9833718 | Deville Revocable Trust | Danielle Gallet | Deville Revocable Trust |

148.    These three trusts incorporated yet another variation of Defendants' deceptive scheme to purchase variable annuity contracts from Lincoln for the purpose of market timing, as

they identified a person, Danielle Gallet, as the trustee for each of these trusts, rather than either Clarion Management or any of the limited liability companies that Defendants had previously used with the other revocable trusts.

149.    Gallet, in reality, was Fife's officer manager, and Fife controlled her at all times relevant to the allegations in this Complaint.

150.    As part of their continuing deception, Defendants designated yet another address to be used for the contract owners: 8700 West Bryn Mawr Avenue, Suite 8055 South, Chicago, Illinois 60631. Defendants' purpose once again was to conceal Clarion Management's continuing role in the contracts. Notwithstanding Defendants' deceptive conduct, Lincoln rejected the applications because it recognized Gallet to be a person associated with previous contracts submitted by Defendants.

151.    Although Lincoln blocked Defendants from purchasing any further contracts, Defendants continued to engage in market timing in the existing contracts they had acquired through deceptive means until restricted to submitting transfer by U.S. mail. On approximately November 13, 2003, Defendants surrendered the last of the contracts that it had caused to be purchased from Lincoln for the benefit of Clarion Capital. Clarion Capital was dissolved shortly thereafter.

152.    Defendants' deceptive practices, as alleged above, were done knowingly and with the intent to deceive Lincoln.

153.    Defendants' deceptive practices, as alleged above, were material.

### *Fife and Clarion Management's Profits and the Damages To Other Shareholders from Their Misconduct*

154.    Through their deceptive scheme, Fife and Clarion Management made hundreds of thousands of dollars for themselves and Clarion Capital. Even after Lincoln expressly informed Defendants that Lincoln objected to their excessive market timing activity and began restricting contracts that Defendants had purchased for Clarion Capital, Defendants did not cease their market timing activity. Instead, Defendants used increasing layers of deception to continue their professional market timing scheme for the benefit of Clarion Capital.

155.    For the period from August 29, 2002 to November 13, 2003, Clarion Capital's profits from market timing in the variable annuity contracts purchased from Lincoln were at least approximately $830,000, of which Clarion Management and Fife took at least approximately $166,000 as a performance fee. Clarion Management and Fife also charged a management fee of at least approximately $51,000 during this period, based on the value of Clarion Capital's assets invested in variable annuities purchased from Lincoln.

### COUNT I

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Fife and Clarion Management

156.    Paragraphs 1 through 155 above are realleged and incorporated by reference.

157.    As set forth more fully above in paragraphs 1 through 155, from August 29, 2002 through November 13, 2003, Fife and Clarion Management, directly and indirectly, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails: (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which

32

they were made, not misleading; and (c) engaged in acts, practices and course of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchase and sellers of securities.

158.    Defendants knew or were reckless in not knowing of the activities described in paragraphs 1 through 155, above.

159.    By reason of the foregoing, Fife and Clarion Management violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Control Person Liability Against Fife Pursuant to
### Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]

160.    Paragraphs 1 through 159 are realleged and incorporated by reference.

161.    At all times relevant to the allegations in this Complaint, Fife controlled Clarion Management.

162.    By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Fife is jointly and severally liable for Clarion Management's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

A.    finding that Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.    finding that Fife was a "control person" of Clarion Management for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)];

C.    permanently enjoining Fife and Clarion Management from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

D.    ordering Fife and Clarion Management to pay disgorgement of ill-gotten gains, plus prejudgment interest, either on a joint and several basis or independently;

E.    ordering Fife to pay an appropriate third-tier civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

F.    retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.    granting such other and additional relief as this Court deems just and proper.

Respectfully submitted,

Kenneth E. Yeadon

Steven J. Levine
      Illinois ARDC No. 6229621
Kenneth E. Yeadon
      Illinois ARDC No. 6273281
Linda T. Ieleja
      Illinois ARDC No. 6204334

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
(312) 353-7390

DATED:  January 18, 2007

34